[No. 10062. Department Two.    October 5, 1912.]

CHARLES I. D. LOOFF *et al.*, *Appellants*, v. SEATTLE PARK COMPANY *et al.*, *Respondents*.[1]

LANDLORD AND TENANT—LEASE—CONSTRUCTION. Where an amusement company leased a portion of its premises, described as five certain lots, for the purpose of an amusement park, the lessee agreeing to pay as rent a percentage of the gate receipts, and not to conduct any bathing establishment, cafe, restaurant or skating rink on the lease premises, and for a time all the property was included within a common inclosure, and the lessor conducted a bathing establishment, cafe, and skating rink on property reserved and not mentioned in the lease, a clause in the lease that the whole of said "eight lots" shall be open to the public upon the payment of a general admission, is meaningless, and the covenants of the lease can refer

[1]Reported in 126 Pac. 902.

only to the five lots described; hence the lessee has no right to control the admission to or the nature of amusements conducted on the lessor's portion of the premises reserved from the lease, and an injunction will therefore not lie to close the lessor's public entrances to the common inclosure and forbidding the lessor to call attention to his free entrances to the grounds; the lessee's remedy being to inclose his own portion of the premises, or by a suit to reform the lease, if it does not express the agreement of the parties.

Same—Construction by Parties. In such a case, the fact that for several years, the only public entrance to the grounds was in charge of the lessee during the summer months while his amusement park was in operation, and that the lessor conducted no amusements on its property other than those prohibited to the lessee, does not aid the construction of the writings, when their subject-matter does not cover the lessor's reserved property, and where the subsequent conduct of the parties may have been the result of independent agreements.

Appeal from a judgment of the superior court for King county, Tallman, J., entered March 6, 1911, in favor of the defendants, after a hearing before the court, dismissing an action for equitable relief. Affirmed.

*Wilmon Tucker* and *Thomas B. MacMahon*, for appellants.

*Ira Bronson*, for respondents.

Fullerton, J.—On January 11, 1907, the appellant Looff entered into a written agreement with the respondent Seattle Park Company, reading as follows:

"It is hereby agreed by and between the Seattle Park Company, a corporation, the party of the first part, and Charles I. D. Looff, the party of the second part, as follows:

"(1)    The party of the first part agrees upon the completion of this contract as hereinafter set forth, to lease to the party of the second part the premises described as follows and upon the terms as hereinafter set forth: The easterly five (5) lots in block 456 of the Seattle tidelands and an undivided one-half ($\frac{1}{2}$) of block 455 of the Seattle tidelands, for the term expiring on the 31st day of August, 1916, subject to renewal as hereinafter set forth.

"(2) It is agreed that the party of the second part shall pay for said lease the sum of $6,521.67 at the signing hereof, the receipt whereof is hereby acknowledged, and shall pay in manner and form as set forth in that certain lease made by the West Seattle Land and Improvement Company to W. W. Powers, J. L. Ward and assigned to the party of the first part, expiring on said 31st day of August, 1916, one-half of the ground rent reserved in said lease.

"(3) All taxes and assessments levied against the improvements and buildings which the party of the second part shall cause to be erected upon the premises described as the easterly five (5) lots of block 456, and one-half of all taxes and assessments levied upon any improvements and buildings erected upon block 455, and one-half of all the taxes and assessments levied upon the premises exclusive of improvements included in blocks 455 and 456.

"(4) The party of the second part agrees to pay to the party of the first part twenty per cent of the gross gate receipts received for general admission to said premises, not including, however, admissions charged for any particular entertainments or amusements situated thereon.

"(5) It is expressly covenanted and agreed that the party of the second part shall have the right to conduct such forms of amusement and entertainment on the said easterly five (5) lots of block 456 as he may desire, including the sale of candies, popcorn, ice cream and soft drinks and cigars, and all slot machines and nickel-in-the-slot machines, except as follows: That the party of the second part shall not conduct any bathing establishment, any cafes, any restaurant or any skating rink on said premises; And the party of the first part shall not conduct any amusements except as specified on said premises.

"(6) It is further agreed that the party of the second part shall keep a strip of ground 50 feet wide easterly and westerly, extending from the north line of said block 456 to the south line thereof, and being westerly fifty feet of lot four therein, clear of obstructions, buildings or improvements as an open way for the general public, and both parties agree that the whole of said eight lots shall be open to the public upon payment of general admission, of which the party of the first part receives twenty per cent and the

party of the second part receives the balance of eighty per cent, except special places of amusement properly enclosed.

"(7)    It is further provided that if the lease from the West Seattle Land and Improvement Company to the party of the first part above described shall be extended for any period of time, that the lease herein provided for · shall be extended for a corresponding period and upon the terms and conditions above set forth.

"(8)    The party of the second part expressly guarantees to expend the sum of $100,000 in the building and erection of such forms of amusement and entertainment as are included within the terms of this lease upon the premises demised to him on or before the first day of August, 1907, and to begin in substantial manner the expenditure of said money and the erection of said improvements on· or before the first day of February, 1907.

"(9)    It is further agreed that time shall be the essence of this agreement and that if the party of the second part shall fail to begin the erection of said improvements or to complete the same as herein provided for, that all rights under this contract shall cease at the option of the party of the first part, and that the party of the first part shall have the right to keep and retain the payment made at the signing hereof, as liquidated damages for said failure.

"(10)    All improvements to be erected upon block 455 shall be paid for in equal proportions by· the parties of the first and second parts hereof, and all revenues derived therefrom shall be equally divided between the parties hereto.

"(11)    It is further agreed that a daily report shall be made by the party of the second part to the party of the first part of the gross gate receipts paid for admissions to all of said premises.

"(12)    Said lease shall be executed and delivered to the party of the second part upon the completion of the terms of this contract as above set forth."

On June 25, 1908, pursuant to the foregoing agreement, the parties entered into a lease as follows:

"This Indenture, made this 25th day of June, in the year of our Lord one thousand nine hundred and eight, between the Seattle Park Company, the party of the first part, and Chas. I. D. Looff, the party of the second part.

"Witnesseth: That the said party of the first part does by these presents lease and demise unto the said party of the second part the easterly five (5) lots in block four hundred and fifty-six (456) of the Seattle tidelands and an undivided one-half (½) of block four hundred and fifty-five (455) of the Seattle tidelands, for the term expiring on the 31st day of August, 1916, subject to renewal as hereinafter set forth, with the appurtenances. Said term beginning with the date hereof.

"The party of the second part agrees to pay as rental for said premises in the manner as set forth in that certain lease made by the West Seattle Land & Improvement Company to W. W. Powers and J. L. Ward, and which lease has been assigned to the party of the first part, and which expires on the 31st day of August, 1916, one-half of the ground rent reserved in said lease, and further the party of the second part agrees to pay all taxes and assessments against the improvements and buildings which the party of the second part, his successors or assigns shall cause to be erected upon the premises, described as the easterly five lots of block 456, and one-half of all the taxes and assessments levied upon the premises, exclusive of improvements included in blocks 455 and 456.

"The party of the second part agrees to pay to the party of the first part twenty per cent of the gross gate receipts received for general admission to said premises, not including, however, admissions charged for any particular entertainments or amusements situated thereon.

"It is expressly covenanted and agreed that the party of the second part shall have the right to conduct such forms of amusement and entertainment on the said easterly five lots of block 456 as he may desire, including the sale of candies, popcorn, ice cream and soft drinks and cigars and all slot machines and nickel-in-the-slot lunch machines, except as follows:

"That the party of the second part shall not conduct any bathing establishments, any cafes, any restaurants or any skating rink on said premises: And the party of the first part shall not conduct any amusements except as specified on said premises.

"It is further agreed that the party of the second part shall keep a strip of ground 50 feet wide easterly and westerly,

extending from the north line of said block 456 to the south line thereof, and being westerly fifty feet of lot four therein, clear of obstructions, buildings or improvements as an open way for the general public, and both parties agree that the whole of said eight lots shall be open to the public upon payment of general admission of which the party of the first part receives twenty per cent and the party of the second part receives the balance of eighty per cent, except special places of amusement properly enclosed.

"It is further provided that if the lease from the West Seattle Land & Improvement Company to the party of the first part above described shall be extended for any period of time, that the lease herein provided for shall be extended for a corresponding period and upon the terms and conditions above set forth.

"All improvements to be erected upon block 455 shall be paid for in equal proportions by the parties of the first and second parts hereof, and all revenues therefrom shall be equally divided between the parties hereto.

"It is further agreed that a daily report shall be made by the party of the second part to the party of the first part of the gross gate receipts paid for admissions to all of said premises.

"And it is hereby agreed, that if any rent shall be due and unpaid, or if default be made in any of the covenants herein contained, then it shall be lawful for the said party of the first part to re-enter the said premises and remove all persons therefrom; and that the said party of the second part does hereby covenant, promise and agree to pay the said party of the first part the said rent in the manner hereinbefore specified. And at the expiration of said term the said party of the second part will quit and surrender the said premises in as good state and condition as reasonable use and wear thereof will permit (damage by the elements or fire excepted)."

While the evidence is not as clear as it might have been made, it can be gathered that Looff, between the date of the agreement and the date of the lease, erected on the lots described in the lease various structures intended for entertainment and amusement purposes, at a cost exceeding that named in the agreement, and that the respondent erected on

the lots remaining in the block a bathing establishment, a skating rink, and a building for restaurant purposes and established a restaurant therein. The whole of the block was inclosed as one tract, and seems to have had but one principal entrance, which opened into the part leased to Looff. The amusement structures put in by Looff were attractive only during the summer months, and were operated by him only during those months. The establishments put in by the respondent were of a different nature, and could be operated to some extent at all times of the year, or at least for a longer period than Looff found it profitable to operate his amusements. The grounds were first opened to the public in 1907, the exact time not appearing. During this year, the place of admission was the main entrance spoken of, which seems to have been in the sole charge of Looff. An admission fee of ten cents was exacted from each visitor, which was divided between the parties in accordance with the ratio fixed in the agreement. How this particular admission charge was determined upon is not shown, but presumably by agreement between the parties; at least, the record is silent as to any disagreement thereover. Looff closed his attractions about the 1st of October following. At this time the main entrance was closed and a fence erected along the dividing line of the two properties, shutting off the public entirely from the property controlled by Looff. The respondent continued to operate its part of the grounds. At what place it opened an entrance to its grounds does not appear with certainty, but it is probable that the public were admitted at a gate used by the parties when the main entrance was open as a place for the admittance of teams carrying supplies and fixtures. It does not appear what, if any, admission fee was charged by the respondent during this period.

Looff again opened his attractions between the first and middle of May, 1908. At this time the fence between the respective parts of the grounds was removed, the point of admission confined to the main entrance, and an admission fee

of ten cents charged as a general admission to all parts of the grounds, the money received therefor being divided as before. This condition continued until the 1st of October, 1908, when Looff closed his attractions for the year. The main entrance was again closed, the division fence erected, and the public visiting the place confined to the respondent's portion of the ground, the point of admission presumably being at the place the public was admitted during the previous closed season. The same course was pursued with reference to the spring of 1909, Looff again opening his attractions at the beginning of May of that year. At the close of the year, however, while the main entrance was closed and the gateway leading to the respondent's grounds opened, no division fence was immediately erected owing to some difficulty between the parties. But it was found later that persons admitted to the respondent's grounds would pass over onto those belonging to Looff and injure and destroy the unguarded property. To stop this, the division fence was erected just before the Christmas holidays. Another difficulty also arose between the parties during this season. The respondent conducted certain games and amusements on its part of the grounds which Looff claimed could, under the terms of the lease, be operated only by himself. An action was begun to restrain their operation, but the trial court decided that their operation was not in violation of the terms of the lease. The judgment of the trial court was affirmed by this court on appeal. *Looff v. Seattle Park Co.*, 59 Wash. 217, 109 Pac. 806.

In the year 1910, when Looff decided to open his grounds, the respondent refused to close its entrance gate. At first it charged a nominal admission fee of one cent, but later discontinued this, and admitted free any person who desired to enter the grounds. It also stationed persons in the street in front of the main entrance, which Looff had opened and was charging an admission fee of ten cents, to call attention to the free gate at another part of the inclosure. The

actions of the respondent were conceived to be in violation of the covenants contained in the contract and lease, and this action was instituted by Looff and his coplaintiff to restrain the same, and to require the respondent to account to the appellant at the rate of ten cents each for the number of persons who had been admitted to the common grounds by the respondent at its entrance gate. Issue was taken on the complaint, and resulted in a judgment in favor of the respondent to the effect that the appellant take nothing by this action. This appeal is from the judgment so entered.

In his brief on this appeal the appellant claims that he is entitled to the following specific relief: (1) An injunction against the respondent, closing all public entrances to the common inclosure except the main entrance before described as entering on the appellant's property; (2) either damages because of the admission of persons at the gate of the respondent, or an accounting for them at the rate of ten cents for each person; and (3) an injunction forbidding the placing of persons in front of the general entrance to call attention to the free entrance on the respondent's part of the grounds. In the course of the argument, it was further contended that, by the terms of the writings as interpreted by their subject-matter and the acts of the parties thereunder immediately following their execution, Looff has the right to require that all persons admitted to the general ground shall enter at the main gate first opened to the public; that he has the right to control the same and to fix and determine what fee shall be charged for admission to the common inclosure; that he has the right to collect such fees, being obligated to account to the respondent for only its proportional share of the same; and that he has the right to open his own ground all or any part of a year, and to determine for himself what season of the year such grounds shall remain open if less than the entire year, and that the respondent must conform its conduct to his acts.

A comparison of these claims with the written conditions of the contract and lease will show that they have but slight foundation on which to stand. Unless the paragraph numbered 6 of the contract, copied verbatim into the lease, is an exception, the covenants all relate to the leased premises. Clearly the phrase "said premises," found in paragraph numbered 4, also copied verbatim into the lease, refers only to the leased premises, as no other premises had up to that time been mentioned. The paragraph numbered 6 provides that both parties agree that "the whole of said eight lots shall be open to the public," but it is impossible to tell what it here referred to for want of an antecedent to the phrase "the whole of said eight lots." Up to this time only five lots in block 456 have been mentioned, namely, the easterly five lots of that block. The natural inference would be that the phrase relates to these specific lots, and that the word "eight" should be "five;" otherwise it is meaningless. The phrase "all of said premises," in paragraph numbered 11, of course can refer only to the premises before described, and if these be only the leased premises, it of course relates to them. This paragraph, moreover, adds nothing to the conditions of the lease, except a covenant requiring the lessee to account daily for the admission receipts. Otherwise he would be obligated to account for such receipts at reasonable times only. The writings, therefore, are intelligible only on the theory that the covenants contained therein relate solely to the leased premises. So construing them, they become at once intelligible and workable instruments, while to attempt to apply the covenants to property in addition to the leased premises results only in confusion. This was the thought that was in the mind of the court when it rendered the decision hereinbefore cited, and induced us to say that the writings contained no restriction on the right of the respondent to use its own premises in its own way for any lawful purpose.

It was earnestly contended there, however, as it is now contended, that the writings refer to other property than merely the leased premises. We answered then, as we answer now, that if this be so, the writings do not express the agreement of the parties, and the remedy "is by action for reformation, and not an action based on a covenant that does not exist." The writings are not aided by reference to their subject-matter or by reference to the conduct of the parties immediately following their execution. When the contract was executed, the lots, in so far as the record discloses, were naked of any improvements, and no new covenants were entered into at the time of the execution of the lease. On the contrary, the lease contains only the covenants of the contract that were not fulfilled at the time of its execution. A reference, therefore, to the subject-matter of the writings in no way aids in their interpretation. Nor does the conduct of the parties following the execution of the writings aid in their interpretation. In so far as it appears from the evidence, the subsequent conduct of the parties may have been the result of agreements independent of the writings entirely; and inasmuch as there is no apparent relation between the covenants contained in the writings and such conduct, the inference is that it was the result of agreement rather than an effort to execute the supposed covenants of the writings. We conclude, therefore, that the appellant has no remedy for the matters complained of in his complaint, under the covenants of the lease.

It may be well, however, to remark that we do not think that our construction of the writings leaves the appellant stranded and helpless, as his argument seems to imply. We have no doubt of his absolute right, as the contract now exists, to inclose his portion of block 456, cutting it off entirely from the part in possession of the respondent, and conduct therein such enterprises as he may deem fit, other than those specially mentioned as forbidden. On the other hand, if the writings do not express the real agreement between

the parties, the remedy is by an action to reform it so as to make it conform to the actual agreement.

There is no error in the record, and the judgment will stand affirmed.

MOUNT, C. J., MORRIS, and ELLIS, JJ., concur.